## DIAMOND DRILL & MACH. CO. v. KELLEY BROS. & SPIELMAN.

(Circuit Court, E. D. Pennsylvania. July 8, 1904.)

No. 49.

1. PATENTS—VIOLATION OF INJUNCTION AGAINST INFRINGEMENT.

Complainant owned a patent for a coil clasp for fastening belts, and also one for a machine for making and inserting the coils. Defendants made and sold coil clasps which were adjudged to infringe complainant's patent, and they were enjoined from further infringement. They also made and sold a machine for inserting the coils, which was adjudged not to infringe complainant's patent. After service of the injunction, defendants having obtained the opinion of counsel that it would not be a violation thereof to direct their customers to others who would supply the coils, their foreman induced a third person to go into the business; and he was given a coil-making machine, and a quantity of wire from defendants' shop, and also furnished with a list of customers to whom defendants had sold machines, and to whom he sent circulars stating that he had taken over the supply business of defendants, and he thereafter filled orders from all customers for the infringing coils. It was also admitted by one of the defendants in his testimony that they had given coils to such party for the purpose of enabling him to sell them to owners of their machines, and that in some instances they had directed them to him. *Held*, that defendants were directly responsible for his infringement, and were guilty of contempt for a violation of the injunction.

2. SAME—DEFENSES.

Where defendants were enjoined as individuals from infringement of a patent, they cannot avoid individual liability for a violation of the injunction by organizing a corporation which commits the acts of infringement.

On rule to show cause why defendants should not be adjudged in contempt for violation of injunction against infringement of a patent.

For previous opinion sustaining the patent and awarding an injunction, see 120 Fed. 282; affirmed on appeal, 123 Fed. 882, 129 Fed. 756.

W. C. Strawbridge, for the rule.

Horace Pettit, opposed.

ARCHBALD, District Judge. The defendants are charged with having violated the injunction which was issued to restrain the infringement of the patent in suit, and which was served upon them January 2, 1903. The affidavits on which the rule to show cause was granted have been materially supplemented by the evidence recently taken in the proceedings before the master for an account, and a state of affairs is disclosed thereby which is decidedly damaging to the defendants, being nothing less than an attempt to overcome the adverse decision of the court by which the patent was sustained, and to evade the injunction issued to enforce it.

The device in controversy is a coil clasp for fastening together the ends of belts, and consists, in general terms, of spiral coils of wire screwed into holes in the ends of the material to be united; the coils being brought together and locked by a pin run through their intermeshing spaces. For convenience of use, a machine which will make and insert the coils is necessary, and each of the parties to this liti-

gation has invented and patented such an accessory device. It was contended by the complainants that in this respect, also, the defendants infringed upon them, the complainants' machine being the first patented; but in a suit brought to test this it was decided by this court, contemporaneously with the determination of the case in hand, that such was not the case, and the defendants were therefore left free to make and use their own. (C. C.) 120 Fed. 289. The result produced by this, however, was somewhat peculiar. The defendants, while entitled to manufacture and sell machines for making and inserting coils, could do nothing with the coils themselves, which were covered and protected by the complainants' patent, and the one was useless without the other. This presented a necessity and a temptation. They could not furnish coils to parties to whom they had sold their machines; neither could they to new customers whose patronage was solicited. As a means of escape from this dilemma, they seem to have thought that it would be no violation of the injunction which had been served upon them if those who applied to them for coils were directed to others, not connected with their business, who could supply them. That they had this distinctly in mind is established by the fact that they consulted counsel upon the subject, and were advised that it was permissible. This has an important bearing on what follows, and must be taken in connection with it. In one instance—in February, 1903—they are shown to have sold coils or lacings and needles to an owner of one of their so-called Peerless machines without any intermediary, which of itself was a disregard of the injunction. But if the matter had stopped there, in all probability these proceedings would not have been instituted. Unfortunately, however, it did not. Even before that, in the latter part of January, a few weeks after the injunction was served, Albert Rahrer, foreman of the defendants' workshop, approached one Hans Hamilton, who had done a little teaming now and then for the concern, with the proposition that he should go into the business of furnishing coils to parties who might order them; explaining to him that the defendants could not, because of the injunction. Turning over to him an old coiling machine and two or three hundred pounds of wire, all of which was taken from the defendants' shop, he gave him, also, a list of former customers who would be likely to need coils; telling him he could go on and supply them, and make what he could out of it. This was the inception of the so-called Hamilton Supply Company, afterwards changed to the Hamilton Spring Company, the better to cover up the nature of what was being done. Following Rahrer's instructions, Hamilton wrote to the parties whose names had been given him, informing them that his company could furnish them with coils; and a printed slip was adopted and sent out, stating that that company had taken over the supply business of the Peerless Belt Lacing Company, under which name the defendants were then incorporated, and that future orders should be mailed to the Hamilton Company, at 120 South American street, Philadelphia. Beginning in this way, the business of furnishing coils has been carried on at the place named ever since. Hamilton claims to be the sole owner of the concern, but is regularly employed by the Bell Telephone Company

to tend switchboard, and only comes to the shop once or twice a day, which is in charge of a man named Charles Simmons, who formerly worked for the defendants. No one is allowed to come in, and parties who want supplies are required to send written orders, stating what they need and furnishing samples. According to Simmons, springs are all that are sold there; his instructions from Hamilton, as he says, being not to sell coils for belt lacings under any circumstances, and the goods being billed to customers as "coil springs." "What the man does with the wire," says Hamilton, "is none of our business. We never inquire." But the fact is that coils for use as clasps are furnished knowingly, and he finally admits it; shielding himself behind the opinion which he advances with confidence, that, if a joint is made with the coil alone, it is all right, and only wrong when a pin is used to fasten it. But even so he is convicted, for he furnishes rawhide pins for that very purpose, when they are ordered; Rahrer, with his other information, having been careful to advise him where the material could be procured.

The law would be a laughing stock if any such flimsy arrangement to get around it could succeed. The infringement of Hamilton is deliberate and obvious; the pretext which he gives, and his attempts to cover it up, only serving the more to fasten it upon him. The only question is how far the defendants are involved. It will have to be admitted that it starts very close to their doors, and I am convinced that it stays there. Not only is Hamilton induced to go into the scheme by Rahrer, their foreman, but out of their shop come the coiling machine and the wire which set him up in business, and from the papers in their office the list of names which is furnished him is obtained. It is difficult to see how any of this could have been accomplished without their knowledge and consent, and it is hardly credible that Rahrer, of his own motion, would make this effort to get around the injunction for their benefit without prompting or suggestion on their part. This is more than a suspicion. It is a conclusion which is forced from the facts found. Nor does it by any means stand alone. It is the undisputed evidence, as we have already seen, that the defendants consulted their counsel to see whether they could not refer to a convenient third party the orders for coils which were sent them by customers; and Spielman, in his answer to the rule, declares that they were under the impression there was no objection to their turning over to another concern, with which they had no connection, "the wires and stuff for fasteners," for which they had no further use, all of which is in exact correspondence with what was subsequently done. It is said, however, that, according to Rahrer, Spielman knew nothing till he inquired what had become of the old coiling machine, and that, when he found out, he told Rahrer that he ought not to have done what he did. Just what this mild protest referred to is not clear. It may have been simply to his giving away the machine and material. At all events, it was not followed up by any effort to stop the infringing use which the gift of these articles incited and furthered. But Kelley, in his testimony, does not pretend to any such want of knowledge. He admits that since the injunction his company has given coils to Hamilton for the very pur-

pose of enabling him to sell them to owners of their machines, and that in some instances they had directed such parties to him. The only qualification that he makes is that nothing of this kind has been done since the proceedings for contempt were instituted. But the mischief was already done when they set Hamilton up in business, and they did not have to do anything more. The significant thing is that he would not have gone into it, except as they supplied the impulse and the means, and they are therefore responsible for his acts. They cannot escape simply because they were not pecuniarily interested, or did not personally participate in them. Neither are they relieved by the advice of counsel, as argued, for they went far beyond it; and at best it could only extenuate.

This observation applies only to Frank Kelley and E. W. Spielman, and not to H. L. Kelley, who seems to have taken no part in what was done, and is only on the record in a representative capacity, as an executor of Edward Kelley, one of the original defendants, who is now deceased. It is suggested in relief of the parties named that since the suit was brought the defendants have become incorporated as the Peerless Belt Lacing Machine Company, which has taken over the entire business, and that they are not, therefore, liable individually. But they were sued as individuals, and the decree and the injunction both went against them as such, and they cannot shield themselves from their individual acts by a subsequent change in their relation to each other. Janney v. Pancoast, etc., Co., 124 Fed. 972.

Let a decree be drawn adjudging the respondents, Frank Kelley and E. W. Spielman, in contempt for having violated the writ of injunction which was served upon them, and imposing a fine of $250, with costs.